Filed 2/24/15  P. v. Turner CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　　v.<br><br>DONALD MICHAEL TURNER, JR.,<br><br>　　　Defendant and Appellant. | F067260<br><br>(Super. Ct. No. F12907807)<br><br><br>**OPINION** |

-ooOoo-

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Fresno County.  James M. Petrucelli, Judge.

Matthew H. Wilson, under appointment by the Court of Appeal, Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]　　　Before Levy, Acting P.J., Cornell, J. and Franson, J.

A jury convicted appellant Donald Michael Turner, Jr., of inflicting corporal injury on a cohabitant (count 1/Pen. Code, § 273.5, subd. (a));[1] forcible oral copulation (count 2/§ 288a, subd. (c)(2)); dissuading a witness (count 3/§ 136.1, subd. (b)(1)); and assault with intent to commit rape (count 4/§ 220), a lesser included offense of the forcible rape (§ 261, subd. (a)(2)) charged in count 4.

On May 10, 2013, the court sentenced Turner to an aggregate 16-year prison term: the upper term of eight years on his forcible oral copulation conviction; a consecutive upper term of six years on his assault with intent to commit rape conviction; a concurrent four-year term on Turner's inflicting corporal injury on a cohabitant conviction; and a consecutive middle term of two years on his dissuading a victim conviction.

On appeal, Turner contends his conviction for forcible oral copulation should be reversed because the trial court committed instructional error. We affirm.

## FACTS

Sandra R. testified at trial that she met Turner in March 2011, and that they lived together from June 2011 through September 2011.

On September 27, 2011, Turner was not home when Sandra arrived home from work at approximately 5:10 p.m. Sandra was not feeling well so at approximately 5:45 p.m. she changed into a slip and a T-shirt and went to sleep in her bedroom. Later that evening, she heard Turner's cell phone say it was 8:05 p.m. and she heard Turner talking to someone on the phone, saying he was going to go out and get drunk so she stayed in bed. The next thing Sandra remembered was being woken up when Turner came into the bedroom, pulled off her blankets, and attempted to take off her slip. Turner then told her, "[T]ake off your fucking clothes, bitch.… [T]ake off your T-shirt." Sandra replied for him to give her a minute. After telling her to spread her legs, Turner put some saliva on his hand and then on her vagina. Sandra was scared because Turner woke her

---

[1]    Unless otherwise indicated, all further statutory references are to the Penal Code.

up and she did not understand why he was upset with her and was calling her "a fucking bitch." She took off her T-shirt because he told her to.

Turner got on top of Sandra and began having intercourse with her but he was hurting her so she told him to stop. Turner, however, continued to have intercourse with her, calling her names, and saying that she was cheating on him. Turner also complained that she was not home when he got there earlier and that she did not smell like him.

Sandra continued telling Turner to stop, that he was hurting her, but he did not stop. She also tried to fight off Turner by pushing on his chest with her arms. This caused Turner to get madder and he threw Sandra's legs against the wall, causing her to cut her foot on a metal picture frame that was hanging there. At that point, Sandra believed that Turner, who kept yelling and calling her names, was going to kill her. Turner then pulled Sandra down, sat on her stomach and began punching her in the face as Sandra used her arms to protect herself. Turner began asking why she had changed her Facebook status to single. He also told her that she did not love him anymore, that she was cheating on him, and that she might as well just kill him. After Turner struck Sandra so hard that she "saw stars," she decided to agree with whatever he said.

Sometime after he stopped having intercourse with her, Turner told Sandra, "[Y]ou don't know who the fuck you're laying next to, I could take you to the brink of death and bring you back." Turner also told Sandra that she should just slit his throat. He then went to the kitchen, got a knife from a drawer, and told her he was sharpening it. This allowed Sandra to get a cell phone from under her pillow but as soon as she finished dialing 911, Turner walked back into the bedroom and took the phone from her. As Turner got on the bed, the knife fell on the bed next to Sandra. He then told her, "[A]re you calling the fucking police, I'm not going to go to prison for something this stupid." As Turner began looking through Sandra's emails, texts, and Facebook page and asking her about them, Sandra noticed the knife next to her and threw it to the ground. Even

though she was scared and believed Turner was going kill her, Sandra managed to act calm.

Eventually, Turner laid down next to Sandra. Turner then asked Sandra to get his cigarettes from his motorcycle, which was in the garage, and she went unclothed and got them. As Turner smoked a cigarette, he told Sandra to place her head on his chest and she complied because she was scared. Sandra also told him three or four times that she was not upset and that everything was okay. Turner then told Sandra that he wanted her to orally copulate him. Sandra told Turner that she really did not want to because her head hurt. Turner replied, "[W]ell, tell your head to stop hurting." Turner pushed her head "down there" and Sandra complied because she believed he was going to hit her if she did not.[2] Afterwards, Sandra laid next to Turner and he told her that she had to "fix this" because she made him love her, that he forgave her for cheating on him, and that he wanted her to love him out of respect, not fear. Sandra responded by telling Turner what she believed he wanted to hear because she was afraid he would kill her if she did not. Turner then noticed that Sandra's foot was cut and asked her if she wanted to go to the hospital. Sandra told him that she did not want to go because she thought Turner was trying to trick her. Turner went to sleep and Sandra stayed awake thinking of how she could escape.

The next morning when Turner woke up, he asked Sandra if she was going to work and she replied that she was. After Turner left for work, Sandra called her alarm company to change the alarm code. On the advice of her uncle, Sandra called the police and had them meet her at a friend's house.

Fresno Police Officer Christopher Cooper testified that he responded to the call and interviewed Sandra. Sandra was shaking and crying while she provided him with a statement. Officer Cooper noticed that Sandra had a cut on one of her big toes, a red

---

**2**    Sandra had orally copulated Turner on previous occasions.

mark on the left side of her face by her temple, bruising on her right arm, and that she complained of pain to her neck, chest, and buttocks.

Officer Cooper further testified that Turner was arrested that day and interviewed at the police department. Turner admitted that the victim orally copulated him before they went to bed and that they had "a disturbance" over Facebook because she had changed her status to single and he was afraid she was seeing other men. He also stated that he got the knife and gave it to Sandra so she could protect herself from him because she was scared of him and that he told Sandra she could stab him with it. Turner denied raping Sandra or throwing her against the wall.

The defense did not present any witnesses.

## **DISCUSSION**

During a conference on jury instructions, the trial court refused the defense's request to charge the jury on the reasonable though mistaken belief in consent defense with respect to the oral copulation charge, i.e., that Turner could not be found guilty of that charge if he honestly and reasonably believed the victim consented to the act of oral copulation. (See *People v. Mayberry* (1975) 15 Cal.3d 143 (*Mayberry*).)

Turner contends the *Mayberry* instruction should have been given because the following circumstances provided substantial evidence of the victim's equivocal conduct that justified charging the jury with this instruction: (1) the victim was no longer resisting his advances when the oral copulation occurred; (2) Turner was no longer angry at that time and his behavior seemed more "'loving'"; (3) the victim made every effort to assure him that she loved him and that everything was alright; and (4) she appeared to consent to an act that she had previously performed during their relationship. Thus, according to Turner, the court prejudicially erred by its refusal to charge the jury with the *Mayberry* instruction with respect to the oral copulation offense. We disagree.

> "In *People v. Mayberry*, *supra*, 15 Cal.3d 143, [the Supreme Court]
> held that a defendant's reasonable and good faith mistake of fact regarding
> a person's consent to sexual intercourse is a defense to rape. [Citation.]

5

*Mayberry* is predicated on the notion that under section 26, reasonable mistake of fact regarding consent is incompatible with the existence of wrongful intent.  [Citations.]

"The *Mayberry* defense has two components, one subjective, and one objective. The subjective component asks whether the defendant honestly and in good faith, albeit mistakenly, believed that the victim consented to sexual intercourse.  In order to satisfy this component, a defendant must adduce evidence of the victim's equivocal conduct on the basis of which he erroneously believed there was consent.

"In addition, the defendant must satisfy the objective component, which asks whether the defendant's mistake regarding consent was reasonable under the circumstances.  Thus, regardless of how strongly a defendant may subjectively believe a person has consented to sexual intercourse, that belief must be formed under circumstances society will tolerate as reasonable in order for the defendant to have adduced substantial evidence giving rise to a *Mayberry* instruction.  [Citations.]  [¶]  …  [¶]

"In *Mayberry*, we held that a requested instruction regarding mistake of fact was required when 'some evidence "deserving of ... consideration"' existed to support that contention.  [Citation.]  In *People v. Flannel* (1979) 25 Cal.3d 668, 684-685, ... we further explained that a trial court must give a requested instruction only when the defense is supported by 'substantial evidence,' that is, evidence sufficient to 'deserve consideration by the jury,' not 'whenever any evidence is presented, no matter how weak.'  Thus, in determining whether the *Mayberry* instruction should be given, the trial court must examine whether there is substantial evidence that the defendant honestly and reasonably, but mistakenly, believed that the victim consented to sexual intercourse." (*People v. Williams* (1992) 4 Cal.4th 354, 360-361, fns. omitted.)

"To warrant a court's giving [the *Mayberry* instruction], the record must contain evidence, whether direct or circumstantial, of the defendant's state of mind at the time the offense was committed." (*People v. Maury* (2003) 30 Cal.4th 342, 425.)

Here, although the prosecution adduced evidence that during a police interview Turner admitted that the victim orally copulated him, there was no evidence presented that Turner told the interviewing officer that he believed the victim voluntarily consented to this sexual act.  Further, since Turner did not testify, there is no evidence in the record that Turner believed that the victim voluntarily consented to orally copulate him, let alone

6

that any of the circumstances he cites were the basis for Turner believing that the victim consented. Thus, the court was warranted in refusing the *Mayberry* instruction based on the absence of this evidence alone.

Additionally, when Turner ordered the victim to orally copulate him, she initially refused. Nevertheless, when he insisted she do so, he had to push her head down in order to get the victim to comply, which she did out of fear that Turner would again assault her if she did not. Further, prior to ordering the victim to orally copulate him, Turner had already forcibly raped the victim, punched her in the face numerous times, and thrown her legs against a wall. He had also verbally abused and threatened the victim, prevented her from calling 911, taken her cell phone, and sharpened a knife in the kitchen and placed it next to her on the bed. Given these circumstances, it should have been patently clear to Turner that the victim was acting under fear and duress in following any of his instructions. Thus, there was nothing equivocal about the victim's conduct in complying with Turner's directive to orally copulate him or any basis for Turner to harbor an honest belief that she voluntarily consented to perform any sex act on him. In any event, even if the record contained substantial evidence that supported a conclusion that Turner honestly believed the victim consented to orally copulate him, given the circumstances noted above, his belief would not have been formed under circumstances that society would tolerate as reasonable. Accordingly, we reject Turner's contention that the court erred by its failure to charge the jury with the *Mayberry* instruction.[3]

## DISPOSITION

The judgment is affirmed.

---

**3** We also note that of the four circumstances Turner cites in support of his claim that the victim engaged in equivocal conduct prior to orally copulating him, one of them is inapplicable. That Turner appeared less angry and that his behavior seemed more loving did not make the victim's conduct more equivocal for purposes of determining whether the victim's conduct might have led him to honestly, but mistakenly, believe that she consented to orally copulating him.

7